AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JUN 0 5 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                            DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )           Case No.
Samsung Galaxy Cellular Phone ) **19MJ2347**
IMEI: 354254090794202 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 371 | Conspiracy |
| 8 USC 1324(a)(2)(B)(ii) | Bringing in for Financial Gain |
| 18 USC 1956 (a)(1)(A)(i) | Financial Transaction Affecting Interstate Commerce |

The application is based on these facts:

Aee attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Salvador Limon, United States Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/5/19

*Judge's signature*

City and state: San Diego, California                Jill Burkhardt, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

## PROPERTY / ITEMS TO BE SEARCHED

The property/items to be searched are described as:

(1) Samsung Galaxy Cellular Phone ("TT-1")
   IMEI: 354254090794202
   Model: SM-J727T1

The items are currently in the possession of the Department of Homeland Security, San Diego Sector, El Cajon Border Patrol Station, 225 Kenney St, El Cajon, California 92020.

## ATTACHMENT B-1

## PROPERTY TO BE SEIZED

The following evidence to be searched for and seized pertains to violations of Title 18, United States Code, Section 371, Conspiracy with the following objects: **a)** To bring to the United States for the purpose of obtaining private financial gain, undocumented aliens, knowing and in reckless disregard of the fact that such aliens had not received prior official authorization to come to, enter, or reside in the United States, in violation of Title 8, United States Code, Section 1324 (a) (2) (B) (ii); **b)** To transport and move within the United States, and attempt to transport and move within the United States, undocumented aliens, in furtherance of violation of law, knowing and in reckless disregard of the fact that said aliens had come to, entered and remained in the United States in violation of law; in violation of Title 8, United States Code, Section 1324 (a) (1) (A) (ii); and **c)** To conduct or attempt to conduct a financial transaction that affects interstate or foreign commerce, involving the movement of funds by wire transfer, knowing that such funds represent the proceeds of a specified unlawful activity, to wit, alien smuggling, with the intent to promote the carrying on of the specified unlawful activity:

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a. tending to indicate efforts to transport or smuggle undocumented aliens;
    b. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to smuggle undocumented aliens;
    c. tending to identify co-conspirators, criminal associates, or others involved in smuggling undocumented aliens or conducting financial transactions related to smuggling undocumented aliens; to include senders and recipients of money wire transfers or directions related to money wire transfers;
    e. tending to identify the user of, or persons with control over or access to, the target phones; or
    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data related to the movement of money or to undocumented aliens.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>Samsung Galaxy Cellular Phone<br>IMEI: 354254090794202 | **AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT** |

I, Salvador Limon, United States Border Patrol Agent, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. This affidavit is made in support of an application for a warrant to search:

   **(A)** One Samsung Galaxy Cellular Phone

   with IMEI: 354254090794202 **("TT-1")**;

**TT-1** is collectively referenced herein as the **Target Telephone**. The **Target Telephone** was seized from Christopher MENDEZ' residence after USBP served a state search warrant. The search warrant was executed on May 16, 2019, on or about the time of the defendant's arrest for conspiracy, criminal and civil forfeiture in connection with that case (19-CR-1570-JLS).

2. As explained further below, there is probable cause to believe that the **Target Telephone** was being used by MENDEZ to communicate with co-conspirators prior to and during alien smuggling events. Probable cause exists to believe that the **Target Telephone** contains evidence relating to violations of Title 18, United States Code, Sections 371, 2 (Conspiracy to bring to the United States for the purpose of obtaining private financial gain, undocumented aliens, knowing and in reckless disregard of the fact that such aliens had not received prior official authorization to come to, enter, or reside in the United States, in violation of Title 8, United States Code, Section 1324 (a) (2) (B) (ii)); violation of Title 18, United States Code, Section 1956 (a) (1) (A) (i) (To conduct or attempt to conduct a

financial transaction that affects interstate or foreign commerce, involving the movement of funds by wire transfer, knowing that such funds represent the proceeds of a specified unlawful activity, to wit, alien smuggling, with the intent to promote the carrying on of the specified unlawful activity); 982(a)(1) (Criminal Forfeiture); Title 18, United States Code Section 2 (aiding and abetting). The **Target Telephone** is currently in the possession of the Department of Homeland Security, United States Border Patrol, El Cajon Border Patrol Station, El Cajon, California 92020.

3. Based on the information below, there is probable cause to believe that a search of the **Target Telephone**, as described further in **Attachment A-1 (TT-1)** will produce evidence of the aforementioned crimes, as described in **Attachment B-1 (TT-1)**.

## EXPERIENCE AND TRAINING

I, Agent Salvador Limon, do hereby declare and affirm:

4. I am a United States Border Patrol ("USBP") agent with the Department of Homeland Security (DHS), Customs and Border Protection (CBP), with the United States Border Patrol (USBP). I have been employed by USBP since June 2007 and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico in October 2007. The 19-week Academy curriculum covered specialized training in the Immigration and Naturalization Act (INA), criminal law, and statutory authority, as well as cross training in Title 21 United States Code, and cross training in Title 19 United States Code, Customs law violations. I have been trained in investigating various violations of Federal Law, including alien smuggling, narcotics smuggling, weapons smuggling, and bulk currency smuggling. I have worked with, and consulted with, other agents who have extensive experience in these types of investigations.

5. I am currently assigned to the El Cajon Border Patrol Station Abatement Team (SAT) in San Diego, California (CA). SAT agents deploy in plainclothes attire and drive unmarked Border Patrol vehicles. I have been involved with investigations for Title 8

2

offenses as well as Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the U.S. Drug Enforcement Administration and USBP.

6. During my career in law enforcement, I have conducted and/or participated in the execution of multiple search warrants, arrest warrants, and criminal investigations of individuals and organizations for violations of federal laws. I have performed various tasks, which include, but are not limited to functioning as a case agent, or co-case agent for investigations of illegal aliens and narcotics smuggling organizations; functioning as a surveillance agent and thereby observing and recording the movements of persons suspected of illegal aliens and narcotics smuggling; interviewing suspects, witnesses, and cooperating individuals with specific knowledge relevant to humans and narcotics trafficking.

7. As a USBP agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure; that is, a government agent engaged in the enforcement of the criminal laws of the United States. Accordingly, I am authorized to request issuance of federal search and seizure warrants. As an agent with the USBP, my responsibilities include the investigation of possible violations of Immigration and Nationality laws (Title 8, United States Code), including alien smuggling in violation of Title 8, United States Code, Section 1324 and related offenses.

8. Through the course of my training, investigations, work experience and conversations with other law enforcement personnel, I am aware that it is common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones and portable radios, as well as other modes of communication, to further their criminal activities. I am also aware that it is a common practice for alien smugglers to communicate with the smuggled aliens regarding smuggling arrangements, pickup locations, and payments and to do so using cellular telephones and portable radios as well as other modes of communication. Conspiracies involving alien smuggling generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail and text messages referring to the arrangements of travel, pickup and payment,

3

names, photographs, text messages, and phone numbers of co-conspirators and aliens to be smuggled.

9. Based upon my training and experience as a USBP agent, and my consultations with other law enforcement officers experienced in alien smuggling investigations, and all of the facts and opinions set forth in this affidavit, I submit the following:

   a. Alien smugglers and traffickers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Alien smugglers and traffickers will use cellular telephones because they are able to actively monitor the progress of the illegal activities from point of origin in Mexico to a point of destination in the United States.

   c. Alien smugglers and traffickers and their accomplices will use cellular telephones because they can easily arrange and/or discuss smuggling fees, availabilities of transportation and costs associated with smuggled aliens.

   d. Alien smugglers and traffickers will use cellular telephones to direct, coordinate the transfer and acquisition of payment for smuggling and trafficking fees, request additional fees from aliens and/or their sponsors, and coordinate with drivers to synchronize an exact drop off and/or pick up time of their aliens.

   e. The use of cellular telephones by smugglers and traffickers tends to generate evidence that is stored on the cellular telephones including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

   f. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

10. The following is based on my personal involvement in this investigation, oral and written reports about this investigation that I have received from federal law enforcement officers, law enforcement record and intelligence checks, conversations with other law enforcement agents, and my review of records obtained during this investigation. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Telephone**, it does not contain all of the information known to me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## STATEMENT OF PROBABLE CAUSE

11. In the summer of 2018, the El Cajon Border Patrol Station Abatement Team (ECJ SAT) and the El Cajon Station Intelligence Team (ECJ SIT), hereby referred to as ECJ Intel, began an investigation into a transnational criminal organization (TCO) labeled and hereby referred to as the LIBERTAD TCO. The LIBERTAD TCO conducts alien smuggling operations near the Port of Entry in Tecate, California, where the rugged terrain is mountainous, rural and covered in dense brush. This area along the border is advantageous to TCOs due the close proximity to State Route 94 and intersecting rural roads, which provides rapid egress routes. ECJ Intel has associated numerous alien smuggling events to the LIBERTAD TCO.

12. In 2017, agents identified the man orchestrating the smuggling events as Luis Antonio MENDEZ-Brahan, also known as "Tony," "Tonio," "Don Tony," and "Don Tonio." Numerous illegal aliens and co-conspirators have given statements to Border Patrol agents identifying MENDEZ-Brahan as the organizer/leader of their respective smuggling events. Many illegal aliens identified MENDEZ-Brahan as the individual with whom they made their smuggling arrangements. Many met face to face with MENDEZ-Brahan and were later able to identify him in photographic lineups. Additionally, phone numbers found in the call log activity of illegal aliens and other co-conspirators have been

linked to MENDEZ-Brahan, which further corroborates that MENDEZ-Brahan is responsible for smuggling illegal aliens into the U.S.

13. In 2018, Co-conspirators stated in post arrest interviews that MENDEZ-Brahan uses his home as a staging point for alien smuggling events. MENDEZ-Brahan utilizes his multi-storied residence to house illegal aliens awaiting to be smuggled. Based on post arrest conversations with illegal aliens agents learned that MENDEZ-Brahan charges between $7,000 and $8,500 per successfully smuggled alien and often charges a pre-smuggling fee or "down payment" of approximately $1000. Most illegal aliens do not carry this much cash, often family members send money via Money Service Businesses (MSB) such as Western Union and Money Gram.

14. Co-conspirators arrested in 2018, stated MENDEZ-Brahan makes use of MSB to collect proceeds of his alien smuggling activities. Financial records checks provide historical data of transactions by MSB utilized by MENDEZ-Brahan to launder money from the United States into Mexico. MENDEZ-Brahan uses his United States citizen adult children, Christopher MENDEZ, Wendy Monserrath MENDEZ and Nancy Jacqueline SUAREZ to receive and send proceeds to him in Mexico. Sponsors of successfully smuggled illegal aliens have been interviewed and confirmed sending wire transfers to MENDEZ-Brahan as well as his U.S. based children as advance payment for their smuggling fees.

15. Agents conducted analysis of data in MSB payment corridors along the border focusing on known members of the LIBERTAD TCO and known associates of MENDEZ-Brahan. The LIBERTAD TCO has been utilizing the following MSB: Western Union, Money Gram, Continental Exchanging Solutions and Maxitransfers. The following key LIBERTAD TCO members were investigated: Luis Antonio MENDEZ-Brahan, his spouse Maria Del Carmen Quiros-Bejarano, his spouse's two adult children, David Ramirez Quiroz and Fernando Ramirez-Quiroz, as well as four of his U.S. born children, Lucila Mendez, Christopher MENDEZ, Wendy Monserrath MENDEZ and Nancy Jacqueline SUAREZ.

6

16. ECJ Intel subpoenaed the MSB and analyzed the wire transfers of Christopher MENDEZ between 2014 and January 2019. Results showed Christopher MENDEZ sent or received 22 wire transfers totaling $21,084. His spouse, Angelica Martinez Flores (not charged), sent or received 10 wire transfers totaling $9,274. Many of the wire money transfers by Christopher Mendez and his spouse were to family members including his father Luis Antonio MENDEZ-BRAHAN in Mexico, but were in fact, as Christopher MENDEZ admitted post arrest, sent to facilitate his father's alien smuggling activities. As more fully detailed below in paragraphs 22-23.

17. On January 31, 2018, in California, Christopher MENDEZ wire transferred $1500 to an unindicted co-conspirator in Tijuana, knowing it was proceeds of alien smuggling. On March 13, 2018, in California, Christopher MENDEZ received a wire transfer of $900 from an unindicted co-conspirator, which was partial payment for smuggling an undocumented alien into the United States. On July 22, 2018, in California, Christopher MENDEZ received a wire transfer of $2,000 from an unindicted co-conspirator, which was partial payment for smuggling an undocumented alien into the United States.

18. On November 17, 2018, an unindicted co-conspirator was apprehended in a foiled smuggling attempt near Tecate, CA. During post arrest interview, the unindicted co-conspirator explained to agents that Luis Antonio MENDEZ-Brahan told the unindicted co-conspirator that upon being successfully crossed into the United States, the unindicted co-conspirator would stay at his son Christopher MENDEZ'S residence awaiting their sponsor.

19. Christopher MENDEZ frequently visits his father Luis Antonio MENDEZ-Brahan in Tijuana, Mexico. MENDEZ-Brahan currently resides in the neighborhood of Lazaro Cardenas, Baja California, Mexico. Records checks reveal Christopher MENDEZ visits Mexico often. In the past year and a half, MENDEZ has crossed into Mexico six times.

20. On May 3, 2019, Christopher MENDEZ, Wendy Monserrath MENDEZ and Nancy Jacqueline SUAREZ were indicted for Title 18 USC Sec 371 Conspiracy: a) To bring to the United States for the purpose of obtaining private financial gain, undocumented aliens, knowing and in reckless disregard of the fact that such aliens had not received prior official authorization to come to, enter, or reside in the United States, in violation of Title 8, United States Code, Section 1324 (a) (2) (B) (ii). b) To transport and move within the United States, and attempt to transport and move within the United States, undocumented aliens, in furtherance of violation of law, knowing and in reckless disregard of the fact that said aliens had come to, entered and remained in the United States in violation of law; in violation of Title 8, United States Code, Section 1324 (a) (1) (A) (ii). c) To conduct or attempt to conduct a financial transaction that affects interstate or foreign commerce, involving the movement of funds by wire transfer, knowing that such funds represent the proceeds of a specified unlawful activity, to wit, alien smuggling, with the intent to promote the carrying on of the specified unlawful activity; in violation of Title 18, United States Code, Section 1956 (a) (1) (A) (i), Title 18 USC 981 (a) (1) (C), Title 18 USC 982 (a) (1) and Title 28 USC Sec 2461(c) Criminal Forfeiture. On the same day, federal arrest warrants (19CR1570-JLS) were issued for Christopher MENDEZ, and his two siblings, Nancy Jacqueline SUAREZ and Wendy Monserrath MENDEZ.

21. On May 14, 2019, a state search warrant (Search Warrant Release/PC 1536) was issued for the premises located at 2610 Yellowstone Court, Wasco, CA 93280 to include all rooms, attics, basements, and other parts therein, the surrounding grounds and any garages, storage areas, trash containers, and outbuildings of any kind located thereon. The target address 2610 Yellowstone Court, Wasco, CA 93280 is located in Kern County.

22. On May 16, 2019, USBP interviewed Christopher MENDEZ' wife Angelica Martinez. During the interview, MARTINEZ was asked why she thought we were searching her home. Martinez stated "because of illegal immigrants." Martinez stated that Christopher MENDEZ' father, Luis Antonio Mendez-Brahan (Herein referred to as Mendez-Brahan), would call her husband MENDEZ and ask for help transferring money

using Western Union, Money Gram or other Money Service Businesses (MSB). Martinez stated that the funds transferred were proceeds from successful alien smuggling operations conducted by Mendez-Brahan. Martinez stated that after a successful alien smuggling event, she would receive approximately $8,000.00 transferred to her using MSBs. Martinez stated that Mendez-Brahan would contact her and give her names of people in Mexico to send money to. Martinez stated that this was often under the direction of her husband Chris MENDEZ. Martinez provided a written consent for agents to search her cellular phone. Agents were able to obtain relevant information gathered from her phone. During the search, Agents noticed a text conversation between MENDEZ and Martinez, where MENDEZ appears to be providing instructions to Martinez regarding wire transfers. MENDEZ provided names, account numbers and instructions he received from his father Mendez-Brahan. During the text conversations, MENDEZ talks to Martinez about having his siblings, to include Lucila Mendez, Wendy Monserrath Mendez and Nancy Jacqueline Suarez to send money to Mexico. Furthermore, MENDEZ also texted Martinez about receiving money into their bank account from different individuals for the purpose of alien smuggling.

23. On May 16, 2019, USBP arrested Christopher MENDEZ and served a state search warrant issued for the residence located at 2610 Yellowstone Court, Wasco, CA 93280. USBP seized bank statements, receipts, documents, weapons, and cellphones, including, Christopher MENDEZ' cellphone (TT-1). USBP agents are certain that the seized cellphone (TT-1) belongs to Christopher MENDEZ due to MENDEZ' driver license and debit credit card store in the cellphone case and to MARTINEZ stating it belonged to him during the seizure. USBP conducted a post arrest interview of Christopher MENDEZ. MENDEZ stated that he was willing to talk to agents without the presence of an attorney. During the interview, MENDEZ was initially uncooperative. Agents informed MENDEZ that they were aware that his father was an alien smuggler. Agents then asked MENDEZ if he had ever received money wire transfers. MENDEZ stated that he has received and sent money transfers to Mexico. MENDEZ stated that he only has one bank account.

Agents asked MENDEZ how much money has been deposited into the account, to which MENDEZ replied, "A lot." When agents asked if it was hundreds of thousands of dollars, MENDEZ said, "Yes." When agents asked if he earns hundreds of thousands of dollars, MENDEZ said "No," but that he did make a lot of money. Agents asked MENDEZ why he received so many wire transfers. MENDEZ stated that his father told him that people would be depositing money into his account for cars he had sold them. MENDEZ said he has helped his dad sell the vehicles. Agents advised MENDEZ that they knew he was not being truthful and that they had talked to his sisters and his wife. Agents asked MENDEZ how much his dad typically sold the vehicles for. MENDEZ stated that his dad sold the vehicles for about four to five thousand dollars. Agents asked MENDEZ why he would receive a one thousand dollar deposit from different subjects if his dad sold the vehicles for a lot more money. Agents advised MENDEZ they had witnesses stating that they sent him money as part of the smuggling fees. Agents told MENDEZ that they knew he recently housed an illegal alien and her son at his residence because they had not paid their smuggling fee. Agents told MENDEZ to be honest and tell his side of the story. MENDEZ asked agents what they wanted to know. MENDEZ said, "Okay I sent the money out." Agents asked MENDEZ what the money was for, to which he responded, "It was for the people." MENDEZ said that people sent him money so he could send it to Mexico. MENDEZ stated, "My dad smuggles people and the money was for smuggling people." MENDEZ then advised agents that he wanted to stop his interview and requested an attorney. The interview and all questioning stopped. On May 16, 2019, at approximately 8:30 p.m., USBP allowed MENDEZ to make a phone call while in custody. MENDEZ called his brother, Cesar MENDEZ through an agency landline telephone. MENDEZ asked Cesar if he could bring his wife to the USBP station to pick up his driver's license and his debit credit card that was with his seized cellphone (TT-1). Christopher MENDEZ' cellphone had a phone case wallet that allowed him to store credit cards and/or any type of identification cards, which again confirms (TT-1), belongs to Christopher MENDEZ.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION
## <u>AS TO THE CELLULAR TELEPHONE</u>

24. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time, and labor intensive and may take weeks or longer.

25. Following the issuance of this warrant, I will collect the **Target Telephone** and subject it to analysis. All forensic analysis of the data contained within the **Target Telephone** and the memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

11

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

27. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that the **Target Telephone** was used to facilitate the offense of alien smuggling. The **Target Telephone** was likely used to facilitate the crimes of aiding and abetting and bringing in an unlawful alien for financial gain and without presentation by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 18, U.S.C. § 2 and Title 8, U.S.C. §§ 1324(a)(2)(B)(ii) and 1324(a)(2)(B)(iii). There is also probable cause to conclude that evidence, fruits and instrumentalities of the illegal activities committed by MENDEZ, as described in **Attachment B-1**, continue to exist on **Target Telephone**.

28. Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal and state law enforcement officer specially trained in digital evidence recovery, to search the property described in **Attachment A-1**, and the seized item listed in **Attachment B-1**, using the methodology described above.

Salvador Limon
U.S. Border Patrol Agent

Subscribed and sworn to before me this 5th day of June 2019.

HONORABLE JILL BURKHARDT
UNITED STATES MAGISTRATE JUDGE

12